# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

WENDY H.,[1]

                                   Plaintiff,

       v.                                      3:19-CV-744
                                                    (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                   Defendant.

PETER A. GORTON, for Plaintiff
JESSICA TUCKER, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 7).

## I. PROCEDURAL HISTORY

Plaintiff protectively[2] filed her application for Disability Insurance Benefits

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. §§ 404.630, 416.340. There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

("DIB") and Supplemental Security Income ("SSI") on January 28, 2016, alleging disability beginning October 15, 2013.[3] (Administrative Transcript ("T.") at 15, 183-91).  Plaintiff's claim was denied initially on May 4, 2016. (T. 97-98, 99-105).  Plaintiff made a timely request for a hearing, which was held by video conferencing on June 25, 2018 before Administrative Law Judge ("ALJ") Alexis Murdock. (T. 32-60).  Plaintiff appeared with her representative and testified at the hearing. (*Id.*)  The ALJ also heard testimony from Vocational Expert ("VE") Cathy M. Hodgson. (T. 55-59).  ALJ Murdock issued an unfavorable decision on August 15, 2018. (T. 15-27).  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on April 22, 2019. (T. 1-5).

## II.   **GENERALLY APPLICABLE LAW**

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such  severity that he is not only unable to do his previous work but  cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or

---

[3]  At the hearing, plaintiff amended her onset date to July 1, 2014. (T. 15, 34-35).

> whether a specific job vacancy exists for him, or whether he would be hire
> if he applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20

C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI

disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an impairment
> which meets or equals the criteria of an impairment listed in Appendix 1 of
> the regulations. If the claimant has such an impairment, the
> [Commissioner] will consider him disabled with-out considering
> vocational factors such as age, education, and work experience…
> Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has the
> residual functional capacity to perform his past work. Finally, if the
> claimant is unable to perform his past work, the [Commissioner] then
> determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from performing

his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v.*

*Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.   FACTS

Plaintiff was born on September 9, 1972, making her 41 years old on her alleged

4

date of onset. (T. 25, 46).  Plaintiff was approximately 5'1" tall and weighed 250 pounds. (T. 45-46).  Plaintiff finished the 11th grade in school and never obtained a General Education Diploma ("GED"). (T. 36-37).  Plaintiff had experience working as a cashier and a customer service representative for Binghamton Giant Market, as a shift manager at Dunkin Donuts,[4] at Artisan Liquors, and for "Home Instead," a company which provided home assistance for the elderly. (T. 37-39).  Plaintiff stated that her most recent employment was at the liquor store, and that she stopped working there because she could no longer lift the cases of liquor. (T. 40).

Plaintiff testified that her "main complaints" were her back, knees, and anxiety. (T. 41).  Plaintiff stated that she had severe arthritis in her back and in her knees, and that recently, she was diagnosed with arthritis in her hip and her neck. (T. 41, 43-44). The pain kept plaintiff from working. (T. 44).  Plaintiff testified that her anxiety began when she witnessed her husband's heart attack in 2005, and it became worse when he required a defibrillator in 2008. (T. 41).  She began taking medication for her anxiety ten years prior to the ALJ's hearing, prescribed for her by her primary care provider. (T. 41-43).  She was still taking three prescriptions for her anxiety. (T. 42).  However, plaintiff was not receiving any mental health treatment or counseling at the time of the hearing.[5] (T. 42).

Plaintiff testified that she lived in a three-bedroom mobile home with her

---

[4] Plaintiff testified that, as a shift manager at Dunkin Donuts, she told other employees what to do, did scheduling and payroll, but did not bake the donuts. (T. 39).

[5] Plaintiff testified that she used to go to "Broome County Mental Health," but there were not many organizations that would accept the plaintiff's insurance, and she had not been to a counselor since her date of onset in 2014. (T. 42).

husband, her son, her daughter, and her eleven month old granddaughter. (T. 48).

Plaintiff was using a cane at the hearing and testified that she used it "a good portion of

the time." (T. 43).  However, she did not need to use the cane "as much" at home

because she lived in a trailer, "and you can hold onto something." (T. 43).  Plaintiff

testified that her daughter was 21 years old and did not work. (T. 48).  She stayed home

to look after her baby and try to help plaintiff. (*Id.*)  Plaintiff's daughter did most of the

grocery shopping, cooked the meals, and did the dishes and the laundry. (T. 48-49, 50).

The other household chores were split between her son and her daughter. (T. 50-51).

Even when plaintiff could go to the store,[6] her son drove her, and she was accompanied

by her daughter. (T. 49).  Plaintiff stated that she could walk through the store and pick

out items, but that her children put them on the "belt" for the cashier, took them to the

car, and carried them into the house. (T. 50).  Plaintiff stated that she had a driver's

license, but did not want to drive because of the medications that she took. (*Id.*)

Plaintiff testified that she could only stand for approximately five minutes before

her legs would go numb or she would begin to have pain, and she would have to sit or

lie down. (T. 52).  She stated that "it used to be 10 to 15 [minutes]." (*Id.*)  Plaintiff

testified that she could only walk continuously for 15 minutes, but that she used to be

able to walk for 20 minutes. (*Id.*)  Plaintiff stated that she did not lift anything, but she

could pick up a gallon of milk with two arms. (T. 53).  Plaintiff had pain when bending

at the waist. (*Id.*)  Plaintiff testified that she went outside, but all she did was sit. (T.

54).  Plaintiff testified that she slept about three hours before she would have to get up

---

[6] Plaintiff testified that two years prior to the hearing, she was able to go to the store more often.
(T. 49).

and move. (T. 54).  She never got "uninterrupted sleep." (*Id.*)  She stated that she slept a total of six hours. (*Id.*)  Plaintiff testified that she would have days when her pain was even worse than normal, including when the weather was bad. (T. 54-55).  When plaintiff had these bad days, which she estimated would be three to four days per month, she would just stay in her room. (T. 55).

The ALJ then heard the testimony of VE Hodgson. (T. 55-59).  The VE characterized each of plaintiff's prior jobs, finding that plaintiff's work at Home Instead was as a Home Health Aid (medium with Specific Vocational Preparation ("SVP") of 3).[7]  Plaintiff's job at Dunkin Donuts was a fast food manager (light with an SVP of 5); and her job at the market was as a customer service clerk (light with an SVP of 4). (T. 55-56).  The ALJ's first hypothetical question assumed a younger individual with a limited 11th grade education and prior work as the VE described. (T. 56).  The individual was limited to sedentary work, except that she could occasionally balance and stoop, but could not kneel, crouch, or crawl. (*Id.*)  She could "additionally"[8] climb ramps and stairs, but could not climb ladders, ropes, or scaffolds. (*Id.*)  Mentally, the individual could carry out simple routine instructions and tasks, as long as there were no fast-paced production requirements. (*Id.*)

Based on the hypothetical question, the VE testified that the individual could not perform plaintiff's past relevant work, but that there was "a range of sedentary

---

[7] The VE stated that plaintiff performed the job as light work, based upon her testimony. (T. 55).

[8] The court notes that the transcript of the hearing contains the word "additionally," but the ALJ's decision states that plaintiff could "occasionally climb ramps and stairs." (*Compare* T. 56 *with* 21).

unskilled work available." (T. 57). These jobs included "addressing clerk" and "order clerk, food and beverage." (*Id.*) However, if the individual were off-task for 15% of the day or was absent from work for more than two days per month, she could not perform any work. (*Id.*) The ALJ acknowledged that the Dictionary of Occupational Titles ("DOT") did not address "production rate pace," being "off-task," or absence from work. (*Id.*) The VE testified that her opinion regarding these additional limitations was based upon "experience and education in the field of vocational work." (T. 57-58).

Plaintiff's counsel was then given the opportunity to question the VE. The VE testified that an individual could not perform at a competitive pace if he or she were off-task more than 10%. (T. 58). Counsel then specifically asked the vocational expert whether her "numbers" correlated to the "occupational employment survey group" ("OES"). (T. 59). The VE answered in the affirmative, and counsel did not follow-up with any further questions. (*Id.*)

Plaintiff's counsel has summarized the medical evidence in his brief. (T. 2-7). Rather than summarizing the records at the outset, I will refer to the pertinent records during my discussion of the plaintiff's arguments, with any exceptions as noted herein.

## IV.   **THE ALJ'S DECISION**

After finding that plaintiff did not engage in substantial gainful activity ("SGA") after her alleged amended onset date, the ALJ found that plaintiff had the following severe impairments: degenerative disc disease of the cervical and lumbar spine; osteoarthritis in both knees; a history of Lyme disease; obesity; an affective disorder, variously diagnosed as a mood disorder and bipolar disorder; and generalized anxiety

disorder. (T. 18).  The ALJ also found that plaintiff had carpal tunnel release surgery in August and October of 2015. (*Id.*)  Within weeks of both procedures, plaintiff had good mobility without pain. (*Id.*)  Plaintiff reported "excellent benefit" and "complete relief" from the surgeries, which she also admitted during the hearing. (*Id.*)  The ALJ found that plaintiff's status post carpal tunnel release was not "severe," but kept in mind that non-severe impairments must ultimately be considered for their effect on the plaintiff's ability to function. (*Id.*)  The ALJ determined that plaintiff's "atypical chest pain" was not a medically determinable cardiac impairment. (*Id.*)

At step three of the sequential analysis, the ALJ found that plaintiff's impairments did not meet or medically equal the severity of a Listed Impairment. (T. 19).  The ALJ considered Listing 1.20 (Major Dysfunction of a Joint) and 1.04 (Disorders of the Spine).  The ALJ took plaintiff's obesity into consideration in accordance with Social Security Ruling ("SSR") 02-1P. (*Id.*)  Although the ALJ found that the signs, symptoms, and laboratory findings of plaintiff's obesity were not severe enough to meet any listing. (*Id.*)  However, the limitations due to plaintiff's obesity would be "reflected in the . . . residual functional capacity." (*Id.*)  The ALJ also considered plaintiff's mental impairments, finding that they did not meet the severity of Listing 12.04 (Depressive, Bipolar, and Related Disorders) or 12.06 (Anxiety Disorders). (T. 19-21).

At step four of the sequential evaluation, the ALJ found that plaintiff had the RFC to perform sedentary work, except that she could occasionally balance and stoop, but could not kneel, crouch or crawl. (T. 21).  Plaintiff could occasionally climb ramps

and stairs, but not ladders, ropes, or scaffolds. (*Id.*)  Plaintiff could understand, remember, and carry out simple and routine instructions and tasks as long as there were no fast-paced production requirements and no production-rate paced work, such as assembly line work. (T. 21).  In making this determination, the ALJ reviewed the medical record and discussed the weight that she gave to various providers, including consultative examiner, Dr. Gilbert Jenouri, M.D. (physical); state agency psychological consultant O. Fassler, Ph.D. (mental); consultative examiner, Amanda Slowik, Psy.D. (mental); treating physician Dr. Kamlesh S. Desai, M.D. (physical); and treating physicians' assistant ("PA") Joseph Brunt (physical). (T. 23-24).  The ALJ determined that, although plaintiff had "severe impairments resulting in functional limitations, she retains the capacity to perform activities within the [RFC] established in this decision." (T. 24).

Based on the RFC finding above, the ALJ determined that plaintiff could not perform her past relevant work. (T. 25).  However, based on the VE's response to the ALJ's hypothetical question, the ALJ determined at step five of the sequential analysis, that plaintiff could perform other work in the national economy.[9] (T. 25-26).  The ALJ found that plaintiff could work as "an addressing clerk" or "a food and beverage order clerk." (T. 26).  The addressing clerk position was sedentary, unskilled, and there were

---

[9] The ALJ also stated that the Dictionary of Occupational Titles ("DOT") did not account for all of the restrictions in the RFC determination. (T. 26).  Thus, the VE relied, in part, on her own professional training and experience, and her testimony in this regard was not "in conflict with the information contained in the [DOT]." (*Id.*)  The ALJ accepted the VE's testimony in accordance with SSR 00-4p. (*Id.*)  The ALJ also specifically stated that, "although given the opportunity at the hearing, claimant's counsel chose not to question the [VE] on her qualifications and made no objections to her testimony or to her service as an expert in this matter." (*Id.*)

approximately 30,000 jobs nationally. (*Id.*)  The food and beverage order clerk position was sedentary, unskilled, with approximately 20,000 jobs nationally. (*Id.*)  Therefore, the ALJ found that the plaintiff was not disabled. (T. 26-27).

## V.    <u>ISSUES IN CONTENTION</u>

Plaintiff raises the following arguments in support of her position that the ALJ's decision is not supported by substantial evidence:

1.    The ALJ's RFC determination is not supported by substantial evidence. (Point I) (Pl.'s Br. at 8-14) (Dkt. No. 9).

2.    The ALJ improperly "rejected" the opinion of PA Brunt. (Point II) (Pl.'s Br. at 14-16).

3.    The ALJ failed to properly assess the plaintiff's need to change positions. (Point III) (Pl.'s Br. at 17).

4.    The Commissioner failed to sustain his burden at step five, and therefore the step five determination is not supported by substantial evidence. (Points IV & V) (Pl.'s Br. at 18-19).

Defendant argues that the Commissioner's final decision is supported by substantial evidence, countering each of plaintiff's arguments. (Def.'s Br.) (Dkt. No. 12).  Plaintiff has filed a reply. (Pl.'s Rep. Br.) (Dkt. No. 15).  For the following reasons, this court agrees with plaintiff and will order remand for further consideration by the agency.

## VI.    <u>RFC</u>

### A.    **Legal Standards**

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work

activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions,

citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### B.     Application

Plaintiff's first three arguments are related and may be discussed together because they form the basis for plaintiff's argument that the ALJ's RFC determination is not supported by substantial evidence.  Plaintiff argues that Dr. Jenouri's consultative opinion does not support a finding that plaintiff can do sedentary work (Point I).  The plaintiff argues that the ALJ improperly rejected the Medical Source Statement ("MSS") supplied by plaintiff's treating PA, which states, inter alia, that plaintiff must change positions frequently (Points II & III).  Plaintiff also argues that her need to change positions frequently is supported by the medical evidence and Dr. Jenouri's evaluation, and that the ALJ improperly substituted her lay opinion for that of the medical providers in making the RFC determination.

There is no question that plaintiff suffers from degenerative disc disease of both the cervical and lumbar spines, together with osteoarthritis in her left knee. (T. 18, 22). Plaintiff has also tested positive for Lyme Disease. (T. 469).  The ALJ found these to be among plaintiff's "severe" impairments and they were confirmed by physicians' diagnoses, x-rays, and MRI results.  The ALJ discussed these diagnoses in her decision, stating, inter alia, that

> [d]iagnostic imaging shows the claimant to have degenerative
> changes in her cervical and lumbar spines, with "moderate"
> bilateral neuroforaminal narrowing at the C5-C6 vertebral
> level, as well as spondylolisthesis at L5-S1 and neural

> foraminal stenosis affecting her bilateral L-5 nerve roots;
> imaging also shows "significant osteoarthritic changes" in
> claimant's knees and physical examinations often show the
> claimant to demonstrate reduced range of motion and strength
> in her spine and bilateral lower extremities, along with
> tenderness to palpation, crepitus, and an antalgic gait.

(T. 22) (citations to the record exhibits omitted).  In determining plaintiff's RFC, the ALJ gave "significant weight" to Dr. Jenouri's April, 2016 consultative opinion, in which he concluded that plaintiff had "marked restriction walking, standing and sitting long periods, bending, stair climbing, lifting, and carrying." (T. 23) (citing T. 346).  The ALJ specifically stated that Dr. Jenouri's report was consistent with his own observations, "and those of other providers which showed the claimant to exhibit decreased motor strength and range of motion as well as an antalgic[10] gait; it is also consistent with the claimant's diagnostic imaging." (T. 24) (citations to the record exhibits omitted).  Dr. Jenouri recommended that plaintiff continue to use her cane because it improved her gait.[11] (T. 344).

Defendant argues that "marked" restrictions are consistent with a finding that an individual can perform sedentary work because sedentary work represents "a significantly restricted range of work." (Def.'s Br. at 7-8) (citations omitted).  While sedentary work is at the lowest exertional level, the concept of sedentary work

---

[10] Antalgic gait means that, in order to avoid pain, the individual puts as little weight on the affected leg as possible. https://www.ncbi.nlm.nih.gov/medgen/533963. This results in a limp. *Id.*

[11] Plaintiff told Dr. Jenouri that she always used a cane and that it was prescribed for her (T. 344).  There is no evidence in this record indicating that plaintiff was prescribed a cane by a physician or any other provider.  That does not change the fact that Dr. Jenouri recommended that she continue to use the cane because it improved her gait.

contemplates substantial sitting . . . , [and] alternating between sitting and standing may not be within the concept of sedentary work."[12] *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (citations omitted).  A "marked" restriction in the central function required in sedentary work does not support the ALJ's finding, particularly when the ALJ accepted that plaintiff had such a restriction.  An "individual [who] may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting . . . is not functionally capable of doing . . . the prolonged sitting contemplated in the definition of sedentary work. . . . Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will." SSR 83-12, 1983 WL 31253, at *4.

"SSR 96–9p, provides that '[a]n individual may need to alternate the required sitting of sedentary work by standing (and, possibly, walking), periodically.  Where this need cannot be accommodated by scheduled breaks and a lunch period, the occupational base for a full range of unskilled sedentary work will be eroded.  The extent of the erosion will depend on the facts in the case record, such as the frequency of the need to alternate sitting and standing and the length of time needed to stand. The RFC assessment must be specific as to the frequency of the individual's need to alternate between sitting and standing.'" *Murphy v. Astrue*, No. 12-CV-6271, 2013 WL 1452054, at *7 (W.D.N.Y. Apr. 9, 2013) (quoting SSR 96–9p, 2006 WL 374185, *7 (1996)).

The court is well-aware that "[t]he regulations do not mandate the presumption

---

[12] To perform sedentary work, a person would generally need to be able to sit for a total of about six hours during an eight-hour workday. SSR 96-9p, 1996 WL 374185, at *3.

that all sedentary jobs in the United States require the worker to sit without moving for six hours, trapped like a seat-belted passenger in the center seat on a transcontinental flight." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).  However, in *Ramos v. Comm'r of Soc. Sec.*, No. 17-CV-4632, 2019 WL 4602826, at *3 (E.D.N.Y. Sept. 23, 2019), the court found that even a "moderate to marked impairment is not consistent with an ability to sit for six hours with only a five-minute break per hour. That is not consistent with even the lower end of a moderate impairment. It is clearly not consistent with a marked impairment."

Plaintiff argues that Dr. Jenouri's assessment of "marked" limitations is too vague to support a finding that plaintiff can perform sedentary work. (Pl.'s Br. at 11-13).  Plaintiff relies upon *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (superceded by statute on other grounds), where the Second Circuit found that the use of the terms "moderate" and "mild," ***without more***, does not permit the Commissioner to make the necessary inference that plaintiff can perform sedentary work.  Plaintiff argues that Dr. Jenouri's finding of "marked" restrictions, without more, is similarly vague.  Cases interpreting *Curry* have allowed the use of such terms to support RFC determinations when the doctor provides additional clarifying information. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013).  In this case, Dr. Jenouri did provide additional information in the form of a thorough physical examination.  However, this additional information supports plaintiff's argument that a "marked" impairment in the ability to sit for long periods is not necessarily consistent with the ability to perform sedentary work.

Essentially, the ALJ concluded that plaintiff could perform sedentary work even though the medical report to which the ALJ assigned "significant weight," opined that plaintiff had a "marked" restriction for walking, sitting, and standing long periods, bending, stair climbing, lifting and carrying.  While the ALJ is not required to accept every portion of a medical report,[13] the ALJ must have some basis for determining plaintiff's RFC, and in this case, the ALJ clearly accepted Dr. Jenouri's assessment of marked restrictions, finding it "consistent" with his own observations and those of other medical providers. (T. 24).  Because he relied on Dr. Jenouri's opinion, substantial evidence does not support the ALJ's RFC findings.

The only other MSS in the record which assessed the plaintiff's functional capacity was a "Questionnaire," authored by PA Brunt, plaintiff's treating provider. (T. 488-89).  Among other restrictions, PA Brunt stated that plaintiff could sit only two to three hours in an eight-hour day. (T. 489).  He also stated that she would have to change positions every thirty minutes. (*Id.*)  PA Brunt also stated that plaintiff would be "off-task" more than 20%, but less than 33% during the day, would have good and bad days, and that she would be absent from work for three days per month because of her "bad days." (T. 488-89).

The ALJ gave "little weight" to PA Brunt's evaluation, first because the report stated that the "applicable period" for his restrictions did not begin until "July 6, 2018," which excluded the "vast majority" of the period at issue. (T. 24).  The ALJ also stated that PA Brunt's evaluation was inconsistent with the "objective evidence of record,

---

[13] *See Matta v. Astrue*, 508 Fed. App'x 53, 56 (2d Cir. 2013) (summary order) (the ALJ's RFC need not "perfectly correspond" with any of the medical opinions cited in his opinion).

which often shows the claimant to exhibit normal strength, range of motion, sensation, reflexes, and gait." (*Id.*)  Finally, the ALJ noted that PA Brunt was not "an acceptable medical source pursuant to 20 C.F.R. § 404.1527(f) and 416.927(f)." (*Id.*)

Under the applicable regulations,[14] a physician's assistant is not an acceptable medical source, whose opinion may be given "controlling weight," but the ALJ should evaluate it among the "other sources" whose opinions may be considered in her analysis. *See Genier v. Astrue*, 298 F. App'x 105, 108 (2d Cir. 2008) ("[N]urse practitioners and physician's assistants are defined as 'other sources' whose opinions may be considered with respect to the severity of the claimant's impairment and ability to work, but need not be assigned controlling weight." (citing 20 C.F.R. § 416.913(d) (1)).  The ALJ's statement that the restrictions listed in PA Brunt's evaluation began on July 6, 2018 is dubious.  PA Brunt signed the MSS on July 6, 2018, and it is likely that he did not intend to state that plaintiff's restrictions "began" on that date, given that there are records indicating that PA Brunt has been treating plaintiff since at least 2016. (*See e.g.* T. 469) (Discharge Summary dated March 21, 2016, naming PA Brunt as plaintiff's treating provider).

The ALJ's second reason for discounting PA Brunt's MSS was that it was inconsistent with record evidence, showing that plaintiff "often" exhibited normal functional abilities.  However, in giving Dr. Jenouri's opinion of "marked" restrictions "significant" weight, the ALJ stated that the opinion was consistent with the record evidence showing that plaintiff exhibited decreased motor strength, range of motion,

---

[14] For applications filed after March 27, 2017, the regulations regarding medical sources have changed, but plaintiff's application was filed prior to this date.

and antalgic gait. (T. 24).  At best, such evidence shows that plaintiff suffers from good and bad days, as is often the case with any chronic impairment.  In fact, PA Brunt's finding that plaintiff could only sit for two to three hours in an eight-hour day, and that she had to change positions frequently is consistent with Dr. Jenouri's finding that plaintiff would have a "marked" restriction in sitting for long periods of time.  Thus, even though PA Brunt was not an "acceptable medical source," the ALJ's reasons for giving his opinion "little weight" are not supported by substantial evidence.

The record contains no other competent medical[15] opinion which supports the finding that plaintiff could perform sedentary work,[16] without additional limitations. The remainder of the record, other than PA Brunt's Questionnaire, consists only of treatment notes and other medical evaluations which do not touch on the plaintiff's exertional abilities.  The ALJ does not explain how Dr. Jenouri's assessment supports a finding that plaintiff can sit for the amount of time necessary for sedentary work or how the rest of the medical evidence supports this finding.  The ALJ cannot substitute her own opinion for the medical evidence. *Kessler v. Comm'r of Soc. Sec.*, No. 17-CV-4264 (JMA), 2020 WL 1234199, at *7 (E.D.N.Y. Mar. 13, 2020).

---

[15] In August of 2013, in a treatment note, Dr. Kamlesh S. Desai stated that plaintiff's lifting should be limited to 25 pounds, but made no reference to any further functional limitations. (T. 281). The ALJ gave this opinion "little weight" and correctly noted that Dr. Desai's opinion was issued a year prior to the plaintiff's amended onset date, with no indication of a time frame for implementation. (T. 24).

[16] The court notes that the physical RFC associated with the state agency's initial denial (which stated that plaintiff could sit for six hours in an eight hour day) was signed by a "Single Decision Maker" ("SDM"), not a physician. (T. 74-76).  The ALJ did not rely on this opinion in any event.  The ALJ did rely on the psychological RFC from the same report, written by consultant O. Fassler, Ph.D. (T. 23).  Plaintiff does not raise any issues with the evaluation of her mental impairments, and the court sees none.

In *Jeffrey A. v. Comm'r of Soc. Sec.*, No. 3:18-CV-1473 (CFH), 2020 WL 1234867, at *9-10 (N.D.N.Y. Mar. 13, 2020), the court found that, based on the record in that case, Dr. Jenouri's "moderate to marked" limitations were too vague for the ALJ to base a light RFC finding.  The court stated that neither the doctor's opinion, nor the ALJ explained how the moderate to marked limitations in various of the functions required in light work supported the ability to perform that exertional level of work. *Id.* at *10.  The court remanded the case for the ALJ to provide reasons tending to support the finding that despite his limitations, the plaintiff was still able to perform light work. The same result is appropriate in this case with respect to plaintiff's ability to perform sedentary work.  Neither Dr. Jenouri's opinion, nor the ALJ's decision explain how "marked" restrictions in various functions, most importantly in the ability to sit for long periods, could support a finding that plaintiff could perform sedentary work.  Thus, the ALJ's RFC finding is not supported by substantial evidence, particularly when the other evidence of record supports Dr. Jenouri's "marked" limitations.

Because the RFC analysis is not supported by substantial evidence, and this case must be remanded for further proceedings, the ALJ's step five determination is similarly unsupported by substantial evidence because it relies on the faulty RFC determination.  The ALJ's RFC failed to mention any additional restrictions on plaintiff's ability to sit when questioning the VE.  While ultimately, there may be jobs available in which the plaintiff could change positions, the ALJ did not include such a restriction in the RFC, and the VE was never given the opportunity to consider the possibility.  The court need not address the plaintiff's step five argument that the VE

did not properly establish the number of jobs that would be available to plaintiff because she based her determination on the "OES" data.

However, the court does note that on remand, if the plaintiff takes issue with the number of jobs provided by the VE, counsel should object to the use of the particular numbers. Counsel's claim that he does not have to object at the hearing because he cannot imagine that the ALJ would rely on those allegedly improper numbers is a weak argument. At the hearing, not only did plaintiff's counsel fail to object but affirmatively chose not to question the VE. (T. 58-59). There are certain circumstances in which an individual does not forfeit claims that he or she failed to raise in an administrative proceeding.[17] However, counsel in this case specifically asked the VE if she were using what counsel now claims is an objectionable method of evaluating job numbers, and when the VE responded that she was using OES numbers, counsel stated that he had no further questions.[18] (T. 58-59).

---

[17] In *Sims v. Apfel*, 530 U.S. 103, 112 (2000), the Supreme Court held that a Social Security claimant need not exhaust issues by raising them for review by the Appeals Council in order to preserve judicial review of those issues. However, *Sims* specifically did not address cases in which a plaintiff fails to raise an issue both before the Appeals Council and before the ALJ. *Id.* at 107.

[18] Plaintiff cannot argue that this is an issue that is unavailable for, or unsuited to, agency determination. It is clearly an issue that is best solved before the ALJ at the hearing, with the VE present who can speak to her choice of methods to determine the number of jobs in the national economy. "Although it appears that the Second Circuit has not yet ruled on this precise issue, a number of district courts in this Circuit have found that failure to raise an issue before the ALJ waives that issue's review by the District Court," particularly when represented by counsel. *Watson v. Astrue*, No. 08 Civ. 1523, 2010 WL 1645060, at *3 (S.D.N.Y. Apr. 22, 2010) (citing cases); *Guzman v. Berryhill*, No. 15-CV-3920, 2018 WL 3387319, at *22 (S.D.N.Y. June 12, 2018); *Lewis v. Berryhill*, No. 3:16-CV-1091, 2018 WL 1377303, at *4 (D. Conn. Mar. 19, 2018) (citing *Plante v. Astrue*, No. 06-CV-972, 2009 WL 1951352, at *2 (N.D.N.Y. July 2, 2009) ); *Carvey v. Astrue*, No. 06-CV-737, 2009 WL 3199215, at *14 (N.D.N.Y. Sept. 30, 2009), *aff'd on other grounds*, 380 F. App'x 50 (2d Cir. 2010). The Ninth Circuit, distinguishing *Sims*, has specifically held that a plaintiff challenging the VE's numbers must raise the issue before the ALJ. *See Shaibi v. Berryhill*, 883 F.3d 1102, 1108-1109 (9th Cir. 2017).

21

## VII.  Nature of Remand

### A.  Legal Standards

"When there are gaps in the administrative record or the ALJ has applied an improper legal standard . . . remand to the Secretary for further development of the evidence" is generally appropriate. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).

### B.  Application

This Court cannot conclude that "substantial evidence on the record as a whole indicates that the [plaintiff] is disabled[,]" and thus, I cannot recommend a remand solely for the determination of benefits. *See Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996).  Instead, I will remand for a proper determination of plaintiff's RFC at step four, and a proper analysis at step five, based upon the RFC determination.

**WHEREFORE,** based on the findings above, it is hereby

**ORDERED**, that the decision of the Commissioner is **REVERSED** and this case **REMANDED**, pursuant to **sentence four of 42 U.S.C. § 405(g)**, for a proper analysis consistent with the court's decision, and it is

**ORDERED**, that judgment be entered for the **PLAINTIFF**.


Dated: May 20, 2020

Andrew T. Baxter
U.S. Magistrate Judge